Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 1 of 35 PageID #: 1168
Status Conference

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION


UNITED STATES OF AMERICA | DOCKET NO. 1:09CR15
|
| OCTOBER 30, 2009
VS. |
| 10:12 A.M.
|
MARK ISAAC SNARR AND |
EDGAR BALTAZAR GARCIA | BEAUMONT, TEXAS

------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 35

REPORTER'S TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

------------------------------------------------------------


APPEARANCES:

FOR THE GOVERNMENT:    JOSEPH ROBERT BATTE
                       KERRY KLINTWORTH
                       ANTONETTA STANCU
                       U.S. ATTORNEY'S OFFICE
                       350 MAGNOLIA
                       SUITE 150
                       BEAUMONT, TEXAS 77701


FOR DEFENDANT GARCIA:  ROBERT A. MORROW, II
                       ATTORNEY AT LAW
                       24 WATERWAY AVENUE
                       SUITE 660
                       THE WOODLANDS, TEXAS 77380

                       GERALD E. BOURQUE
                       ATTORNEY AT LAW
                       24 WATERWAY AVENUE
                       SUITE 660
                       THE WOODLANDS, TEXAS 77380

2

FOR DEFENDANT SNARR:     GEORGE PATRICK BLACK
                         FEDERAL PUBLIC DEFENDER
                         110 NORTH COLLEGE
                         SUITE 1122
                         TYLER, TEXAS 75702

                         DOUGLAS MILTON BARLOW
                         ATTORNEY AT LAW
                         485 MILAM
                         BEAUMONT, TEXAS 77701


COURT REPORTER:          TONYA B. JACKSON, RPR-CRR
                         FEDERAL OFFICIAL REPORTER
                         300 WILLOW, SUITE 239
                         BEAUMONT, TEXAS  77701



   PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
 TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

(Open court, defendants present)

THE COURT: This is Case No. 1:09CR15, *United States of America versus Mark Isaac Snarr and Edgar Baltazar Garcia.*

Are you ready to proceed?

MR. BATTE: Ready, your Honor. The government is ready. Joe Batte, Kerry Klintworth, and Antonetta Stancu for the government.

MR. MORROW: Robert Morrow and Gerald Bourque for Mr. Garcia, your Honor.

MR. BARLOW: Doug Barlow and Mr. Pat Black for Mr. Mark Snarr, your Honor.

THE COURT: All right. This is a status conference today. So, we need to talk about the status, I think. We also -- we're having the jury coordinator discuss the progress being made on getting the jury.

Before we do that, is there anything you want to bring up?

MR. BATTE: Not from the government, your Honor.

MR. MORROW: Judge, would this be a good time to talk about the motion deadline on November the 9th? Would that be appropriate at this point?

THE COURT: We can talk about that.

MR. MORROW: Judge, we have a deadline to file

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 4 of 35 PageID #: 1171
Status Conference

4

our guilt motions by November the 9th. We spoke with Mr. Batte yesterday about requesting an extension on that. Discovery is coming in to us. I think he told me yesterday that the guilt discovery has been concluded, but we're still getting punishment discovery. But there's also a matter of BOP records of the discipline of the guards that were involved in this incident, and we have to bring a motion to the court to ask that those reports be provided to us because they will not be disclosed without an order from the court. Bottom line, your Honor, is we still have more information coming in. We would ask for a 30-day extension on the deadline for filing our guilt motions which are currently now due November the 9th.

THE COURT: What's the government's position on that?

MR. BATTE: I think I agree with everything that Mr. Morrow said, first of all. We don't really object to them moving the deadline. If --

THE COURT: Well, I just wonder how that's going to fit into everything else. I mean, is it going to affect other deadlines?

MR. MORROW: His response deadline, obviously. You gave us until February to file the punishment motions, and we hope we will be -- we are going to work

Case 1:09-cr-00015-MAC-KFG Document379 Filed 10/06/10 Page 5 of 35 PageID #:9172
Status Conference

5

to meet that deadline; so, it wouldn't affect that.

THE COURT: Okay. Well, whatever orders you need, get that to me. I will sign them, to get the information that you need.

MR. MORROW: Yes, judge. Thank you. We will.

THE COURT: I don't have a particular problem with moving that if no one has a problem with it.

MR. MORROW: Thank you.

MR. BATTE: Okay.

THE COURT: All right. So, we'll move that guilt/innocence pretrial motions -- is December 9th a business day?

COURTROOM DEPUTY: It's a Wednesday.

THE COURT: Okay. So, that will be fine.

MR. MORROW: Thank you, judge.

THE COURT: But just get me that -- whatever it is -- it has to do with the guard's disciplinary records, people who were involved in the incident?

MR. MORROW: Yes, your Honor.

THE COURT: Okay. Does the government take a position on that or --

MR. BATTE: Well, your Honor, I've done a summary that I've given to the defense about what I think is admissible in terms of what the prison found the guards to have done wrong in their own internal

investigation. There's a full report that the office of internal affairs did prior to sanctioning the guards and some of them are going to be witnesses and the ones that are going to be witnesses, I've identified what the findings were.

In other words, for example -- by way of for example, they didn't have -- the internal investigation found that they didn't have enough staff escorting Mr. Snarr and Mr. Garcia back to their cell on that day and it was a violation of policy. The internal investigation made that finding, and the guards that will testify were sanctioned as a result of that. I did a summary as to what the investigation found and what the sanction was and I wrote it up and presented it to defense counsel, but there's a -- an entire report that contains other information not specific to these witnesses that I didn't feel comes under *Giglio*. But defense counsel wants to see that, and I understand why they would want to. The Bureau of Prisons doesn't want to disclose that for privacy reasons.

So, what I said was, when Mr. Morrow asked me for a copy -- and I presume Mr. Black and Mr. Barlow want one as well -- I said I'm not going to give that to you because I don't think it's relevant as *Giglio*, unless the court orders me to and then that way I'm covered and

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 7 of 35 PageID #: 1174
Status Conference

7

there's a protective order in place where, you know, if you decide that's something to let them have, they know that that can't be disclosed beyond themselves. In other words, I don't want copies of this report made and being distributed and somehow getting out. Not that I think that they would, but that's what the Bureau of Prisons is concerned about. And, so, my position is I'm not going to give that report out unless Judge Crone orders me to give it, and then I'm going to ask that you do a protective provision in there.

THE COURT: Okay. What I think you need to do is file a motion, because I don't have a motion. Then I probably need to look at this report in camera. Maybe there's things that should be redacted. I don't know what's in the report. So, it's hard to say.

MR. BATTE: That's fine.

THE COURT: And that might solve some of the problems. And certainly we would want it -- a protective order, I would think.

MR. BATTE: That's fine.

MR. MORROW: We'll have that to you in advance of the deadline, judge. We already have a draft that we've been circulating; and we'll have it to you the first of next week, if that's okay.

THE COURT: Okay. All right. That will be

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 8 of 35 PageID #: 9175

Status Conference

8

good.  So, if you have the thing available so I can look at it -- how long is this report?

MR. BATTE:  Judge, I want to say it's 15 pages.  It's somewhere around there.  It's not, you know, terribly lengthy.

THE COURT:  But I guess I need to know which people might be witnesses or not.

MR. BATTE:  Well, I think there's a couple of issues.  One is the impeachment issue; and then the other is, you know, it may contain, in the defense's eyes, mitigating evidence of some sort.  So, that's something I guess that they're going to want you to consider, you know, in terms of giving it over.

I don't really have a problem giving the report over.  It's the protective part of it that I'm concerned with.

MR. BLACK:  Your Honor, if I can just add. We've had this issue come up before.  In fact, Mr. Batte and I -- I think we had this similar issue come up in the *Agofsky* capital murder case and in that case the entire report was given to the defense counsel to read and review and to use as necessary, but a protective provision was -- there was actually an order entered by the court saying that the defense could use it for trial preparation as necessary to effectively represent the

people that were named in the indictment but obviously we could not, you know, disseminate it, you know, freely to the public. It was to be used for trial preparation and for actual cross-examination at trial only.

So, I think I can speak for the co-defendant in this case as well and for their legal counsel that we're not opposed to some type of order being entered that would protect Mr. Batte's concerns and, also, it's BOP, I think, that has the main problem with this.

THE COURT: All right. Well, give me a draft of whatever order you might propose to protect it.

MR. MORROW: Judge, if I could just follow up on that. Mr. Black's point is well taken. And we wouldn't want to put the court in a position of determining what's mitigating and what's not when you don't know our punishment case. So, we would ask that the whole report be given to us with a protective order as opposed to anything being redacted at this point and that way you wouldn't be put in that position of trying to decide, you know, what we should or shouldn't get.

MR. BLACK: And that's what was done previously, your Honor, with the BOP records that were given to us.

THE COURT: Okay.

MR. BLACK: As long as we had, you know,

Case 1:13-cv-00723-MAC-CLS Document 160-4 Filed 10/06/10 Page 10 of 35 PageID #: 16138

restrictions which protected everyone and, yet, they were reasonable as well.

THE COURT: I just think there might be something that's kind of irrelevant that might be -- I don't know what's in the report. So -- okay.

MR. BLACK: Well, I guess if Mr. Batte can look at it, if he feels like that there is something that may need to be redacted or have some concerns about, we can certainly visit with him about that.

THE COURT: Okay.

MR. BATTE: Okay.

THE COURT: All right. Anything else?

MR. MORROW: That's all I have, judge. Thank you.

THE COURT: All right. Ms. Harper, do you want to come talk about the jury?

MS. HARPER: We are just now starting the process of building our new jury wheel for this case. We will be sending out approximately 1500 to 1700 juror qualification questionnaires. That is our first step in our procedure, which is outlined by our jury plan.

(Reading) Prospective jurors will be mailed a qualification questionnaire form to complete and return to the court. After the court determines that they are qualified to serve, the names are entered into a pool and

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 11 of 35 PageID #: 1178
Status Conference

11

then they will be randomly summoned for the jury selection date.  The counties that are included for the Beaumont division are Hardin, Jasper, Jefferson, Liberty, Newton, and Orange.  The juror names are chosen at random from a master registration list that is maintained by the Secretary of State of all persons registered to vote.

And I do have a copy of the jury plan and the juror questionnaire that we'll be sending out, if each side would like a copy of that.

THE COURT:  Would you like a copy of that?

MS. HARPER:  It's on our Web site, the plan is.

THE COURT:  Okay.  Am I hearing "no" from counsel?

MR. MORROW:  We'll have access to it through the Web site, your Honor.  Thank you.

MR. BLACK:  That's correct.  We do not need a copy provided.  We can obtain one, your Honor.

THE COURT:  All right.

MS. HARPER:  That's all I have at this point.

THE COURT:  Well, one thing that came to mind on this, because we're doing this together, is there may be need for more peremptory challenges.

Have you thought about that?

MR. MORROW:  Judge, I don't mean to give away

Case 1:09-cr-00015-MAC-KFG   Document 379   Filed 10/06/10   Page 12 of 35 PageID #: 11179
Status Conference

12

any defense secrets; but certainly one of our motions will be a motion for severance. So, we hoped that you would let us file that and get a ruling on that before you go too far down that road of dividing up the peremptories.

THE COURT: Well, I think I've already thought about this; and I'm not inclined to grant a severance. So, if you want to get some more peremptories, maybe you need to talk to me about it.

MR. MORROW: Yes, your Honor. We'd like some extra ones.

THE COURT: But, then, you have to understand the problems that are involved in doing that because only 200 people can be in Judge Heartfield's courtroom. That's who comes the first day, and they fill out the questionnaires. So, you may get 200. The last trial with only one defendant, we got up to 180. We were at that point. So, we were -- there weren't many left over, and that was with 20 peremptories per side.

So, with that number showing up, I mean, I don't see more than a couple more peremptories per side feasible out of that group. If you want more than that, then we have to do something in another courtroom, I guess, the same day because I -- the people can't physically be in there. We'd have to do another

proceeding in another courtroom and do sort of the same thing, less people, because none of the other courtrooms will hold that many people, and do the same thing.

MR. BARLOW: Did I understand the court correctly? 200 people? I thought it with a 250 that were --

THE COURT: 250 came, but I think only 200 actually --

MS. HARPER: 200 are actually pulled for the strike list and are seated.

THE COURT: In that room. We have some spares on reserve because people that day don't show up.

MR. BARLOW: Was it also because we entertained some of those on-the-spot challenges or excuses?

THE COURT: I think maybe the administrators got some people excused earlier.

MS. HARPER: Well, like we had somebody that was sick that morning. The extras are just in case we do have to pull somebody from the courtroom and bring them back up, in case they get sick; but they are actually in the jury room on that day.

MR. BARLOW: And I do recall in the past when the jurors are actually -- the particular jurors are actually summoned, the lawyers from each side have met up

Case 1:13-cv-00723-MAC-CLS Document 60-4 Filed 01/25/23 Page 14 of 35 PageID #: 1142

Status Conference

14

here at the clerk's office to examine the ones who want to claim an excuse so we could agree on some of those who --

THE COURT:  Right, ahead of time, as I recall.

MS. HARPER:  That's correct.

MR. BARLOW:  And if there was a question on either side, they were kept in the pool.

THE COURT:  That's right.

MR. BARLOW:  But if we both agreed, you know, that they were 80 years old and did not want to serve, then they were excused or something like that.  So, we culled through a lot of them like that.

THE COURT:  You culled through some.  The problem is when they show up, then they have more excuses.

MR. BARLOW:  And, also, probably as soon as a few of them find out they can be excused, then the line keeps growing longer.

THE COURT:  Right, exactly.  Word gets out. And a lot of them, I mean, they just didn't bring it up before.  They should have brought this up.  If it comes out that they're 90 years old and they can't hear, well, it's kind of bad when they're here and you're having to deal with them.  I mean, some people were certainly excused that day because of the lining up; and, so, we

Tonya B. Jackson, RPR-CRR
051972409.654.2833

Case 1:09-cr-00015-MAC-KFG   Document 379   Filed 10/06/10   Page 15 of 35 PageID #: 1182
Status Conference

15

already went through a lot of those people before you even started individual voir dire.  So, you get -- there's a big attrition rate.

MR. BOURQUE:  If I may, judge.

THE COURT:  But then I'm saying -- the 200 I'm talking about, those are people who actually survived that cut and actually filled out questionnaires.  So, we had already gotten rid of a bunch of them and, so, you had the questionnaires and we got up to 180 on those to do that.

Go ahead.

MR. BOURQUE:  Well, one of the things I was going to say, judge, assuming that there isn't going to be a severance, which the court is speaking to this morning, it seems to me that obviously we're going to have two defendants in the courtroom, two sets of lawyers at the defense table, the government's side; and I think that -- I know that generally what we try to do is to get that 200 or 250 people in the courtroom one time, get the process started, and then get it started down the track; and I think sometimes -- and I -- just a thought.  I think that if we begin voir dire at the scheduled time, we might want to think in terms of two waves, where you bring that first set of veniremen in in their pool and then you have a second wave on reserve.  If we happen to

work our way through the entire pool and not fill our juror box, then we bring in a second wave and begin anew to fill out what's left.

And it's just a thought.  But I do believe -- because there are going to be issues that are going to surface that are not going to be solved by giving the defense two extra peremptories and then -- and I'm just guessing at that, but everything that seems simple in the practice of law winds up to be more complicated in its application.  So, I think that we should be prepared to maybe do it in two waves.  We can still do everything on time and timely through the system the way it is now but just set it up in sort of a two-wave concept.

If we get through that first 200 and we've got them in the box, we're good to go, the next group -- the second wave never comes; but if we don't have enough, then we can be prepared to go from there.  I mean, I think that -- my experience has been the court works very hard on these cases; the lawyers are ready; and once you get started and we get moving, we go.  But I think that might be a good idea.

THE COURT:  Well, the problem is -- that's not going to work because you've got to exercise all your peremptories at once.  I mean, the challenge for cause people, that's who trickle through.  I mean, you don't do

the peremptories until we get through with all those people. So, you're thinking we have two waves and then we get rid of all the challenge for cause people and then we do peremptories?

MR. BOURQUE: Well, I think that we need to be just open to the concept. If we get through the first 200 and we haven't used all our peremptories and they haven't used all theirs and we only have eight in the box -- you understand what I'm saying -- that we may --

THE COURT: Well, you don't have anybody in the box.

MR. BOURQUE: I understand.

THE COURT: It's just like those people who have passed through cause scrutiny but --

MR. BOURQUE: I understand. But on our side, we're kind of keeping a tally as we're going along, you know. So, we kind of have an idea of where we are; and we just have to, you know, try to work with both sides toward the middle in an effort to accommodate the court so that you don't stuff 300 people in a 200 box. That's all I'm trying to --

THE COURT: No, we can't do that. That's -- but it's my concept with the two waves that the two waves happen the same day, sort of like, you know, aftershock or something; but it's the same day in another courtroom.

MR. BOURQUE: And I'm not opposed to that. I'm just thinking --

THE COURT: But it's going to be kind of exhausting because the first one -- and I think it takes maybe -- and you probably know better than I how long it takes for that first day. It's like an hour, hour and a half or so when they show up and we just say some general things and then they break up and fill out their questionnaires after lunch; and that's when the people start coming in with excuses. But it takes a long time just to get them assembled here and they get photographed and they get arranged in order and things like that.

But I think Ms. Harper thought we could do -- what were you -- we were discussing this yesterday. What was your --

MS. HARPER: We would still do the 200 in Judge Heartfield's courtroom and the second voir dire we could do in here and we could at least put 50. So, you would have 250 on the original strike list.

THE COURT: But you would have to -- maybe we would start earlier for the first group. Of course, that's hard because it takes a while to get them --

MS. HARPER: It takes a while for them to get the pictures and for them to be seated in the courtroom.

THE COURT: So, right after we do that, then

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 19 of 35 PageID #: 1186
Status Conference

19

everybody comes down here; and we do the next group.

MS. HARPER: The next grouping, yes.

THE COURT: And then everybody -- the first people have already gone to lunch, and these people go to lunch --

MS. HARPER: And we'll just tell them where to come back to fill out that second juror questionnaire and then turn it in --

THE COURT: We've got to eat lunch really fast. Okay. And then they've got to come back that day.

But I guess my question is, assuming it's not severed, what -- how many peremptories more are we talking about? Because 50 won't give that many more. I mean, it's some more. But what -- what did you have in mind?

MR. BOURQUE: Well, until --

THE COURT: And I went to a workshop on this, and things went all -- across the board. Some people got absolutely no extras. Some people got some extras when they -- and a lot of people tried defendants together. I mean, I know we've already severed here; but that has not really been the practice that I saw across the country.

MR. MORROW: Judge, the only problem for us answering the question is -- we want to try to, but it's so dependent on the panel we have in front of us. So,

Case 1:13-cv-00723-MAC-CLS Document 60-4 Filed 01/25/23 Page 20 of 35 PageID #: 1654

Status Conference

20

the way I've always been taught to do it is however many challenges for cause we make that you don't grant, that's how many peremptories we're going to ask for.  So --

THE COURT:  Well -- but no.  You've got to ask for them ahead of time.  It's not going to work that way.  It's like you were told you've got 20 ahead of time by the rules.  We're not just going to do it, "Oh, well, now I want -- now I'm going to get ten more."  No.  We're going to do this ahead of time and decide so we can get enough people here to deal with this.

MR. MORROW:  But, judge, we -- not to argue with the court, but we have to be able to respond to what happens in the courtroom and if we think we made a valid challenge for cause and you deny it, we're going to be asking for a peremptory on that basis.

THE COURT:  Well, okay, but no, you're not going to be asking for any more.  You're going to get a set amount -- well, you're not going to get it.  I mean, you -- I can give you 25 peremptories to start with, and that's it.  I mean, I don't care.  There may be some people you want to get rid of, but you can't do that.

MR. BOURQUE:  Well, I was thinking half again as many, as opposed to 25, 30.  And the problem is you give us 25, which one of us gets 13?

THE COURT:  26.

Tonya B. Jackson, RPR-CRR
051978409.654.2833

MR. BOURQUE: 30 is a good round number.

THE COURT: I thought about 30. I think the problem with 30 is I don't even know with the supplemental 50 will that be enough to do that.

I don't know if the government has any idea about that.

MR. BARLOW: The only other thought I have, your Honor, is we can -- it's a grueling day that first day, but it's not something we haven't gotten through before a number of times. We could do it twice, just replicate it the next day. Have one pool one day where we can do it and the next pool the next day and we'll have all the people we'd need like that, could possibly need.

MR. BLACK: That may be something for the court to consider, your Honor, because if the case is not going to be severed, I would not be opposed to do it in two waves. Have Ms. Harper bring in -- do the normal routine on Day 1 and then on the second day she summons the second group of people and basically we're doing the same thing to be sure that we have a sufficient number, even though I -- I think that's the safe way to do it and I think it would be easier on Ms. Harper and the court if we were to split it up into two separate days as opposed to trying to bring in a whole lot of people on that one

Case 1:09-cr-00015-MAC-KFG  Document 379  Filed 10/06/10  Page 22 of 35 PageID #:  1189
Status Conference

22

marathon day.

THE COURT:  We have two kind of marathon days.
Okay.  But then you would have to have 400 people.

Are you going to have enough to be able to
have 400 people show up?

MS. HARPER:  Well, I mean, we're just in the
beginning.  We can actually bump up the number of
questionnaires we're going to send out.  That's not a
problem.

MR. BLACK:  Correct.  So, I think that's
something that -- you know, unless Ms. Harper has
something that she thinks might be a better idea based on
what she's heard from a procedural standpoint or if she
has some ideas -- if there's something that she thinks
that we've talked about is not workable, then I think we
should listen from her; but if she thinks we could
possibly do it in two waves, identical days, Day 1,
Day 2, with two different groups, that would ensure that
we would have a sufficient number of people.

As far as number of peremptory challenges,
once again, that's not something that I was really
prepared to discuss today but I think it is something
that needs to be addressed sooner as opposed to later and
I think somewhere --

THE COURT:  That's why we have to talk about

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 23 of 35 PageID #: 1190
Status Conference

23

it now, because this is something that she --

MR. BLACK: Yes, something around -- and I think that gets into the number of people. And regardless of the court's final decision, if we were to do it two separate identical days in two waves, that would eliminate any potential problems; but I think somewhere around the neighborhood of 30 would be something to consider. And if we run into unforeseen circumstances, I mean, obviously the defense can always request additional; and that would be up to the court at that time to grant it or not grant it.

But I do understand the court's preference to coming up with a set number, whether it be 30 -- and that's our starting point and maybe the ending point. And we can always request more if something unforeseen happens or new developments.

THE COURT: What's the government's position on this?

MR. BATTE: Your Honor, as I'm sure you can predict, the government's position is that we don't want any more peremptories. So, my suggestion would be -- and I agree with Mr. Morrow's -- what he suggested, which is you really don't know how many peremptories you really should get until after the jury selection. You ask for additional peremptories at the end of the voir dire.

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 24 of 35 PageID #:9191
Status Conference

24

So, my suggestion would be similar to what Mr. Black stated, that we add more -- we front load more jurors at the beginning.  If we have to do it in two days and bring 400 in so that we're sure that it -- if it's 30 peremptories -- it may be more.  I hope it's going to be less, but at least that way it would be covered.  But I don't think that right now is the right time to decide how many additional peremptories.

THE COURT:  Well, right now is when the court is going to decide.  So, it may not be your time; but it's my time because it affects what we do, as to how many we get.

MR. BATTE:  I understand.  You asked what our position was, and that's what it is.

THE COURT:  Okay.  That's good.  All right.  That's your position.  I think you should have availed yourself of some peremptories that you didn't use before.  So, anyway -- maybe you don't want more.  I think more would be good.

MR. BOURQUE:  The way we have the perfect solution, the government gets 20, the defense gets 30.

THE COURT:  That's not going to work.  You're going to get the same number whether you want it or not.

MR. BATTE:  Your Honor, on the issue of severance, I would -- I know that we have -- and we

Case 1:13-cv-00723-MAC-CLS Document 160-4 Filed 01/25/23 Page 25 of 35 PageID #: 9192

25

agreed to put back our motions but we don't have a status conference scheduled until February and that would be at this time the first time that the court would be considering a severance. Obviously it's going to have to have a hearing. We would ask that you move that timetable at least for a severance up because we've got potentially a hundred witnesses to get together on punishment in this case; and if you do sever the case out, then obviously probably about half of those punishment witnesses we won't need for May. And I would ask the court to consider moving the deadline for deciding the severance issue up so that we're not in a position where, you know, we're scheduling people to come in and then we have to stop.

I don't know how complicated the severance issue is; but I would ask that that particular motion, if you could keep it at the regular deadline, and then perhaps set before the first of the year a hearing on the severance issue in case you do decide to grant it. Then we all -- obviously we'd have to put any scheduling order and everything else in effect.

MR. BLACK: Your Honor, I agree with what Mr. Batte is saying. In fact, I think a severance motion is part of what I conceive as the guilt/innocence motion. I think the severance motion should be one of those filed

Case 1:13-cv-00723-MAC-CLS Document 160-4 Filed 10/06/16 Page 26 of 35 PageID #: 16514

26

on or before the December 9th deadline that we've already talked about.

THE COURT: Can you do it by the November 9th deadline?

MR. BLACK: Probably not, but I think it would not be that long after. In fact, I think we can probably have it done with a 2-week extension on that particular motion as opposed to a 30-day extension. We could probably get it done before December the 9th, but --

THE COURT: Okay. November the 23rd. That sounds Thanksgiving-ish. I don't know. When --

MR. BLACK: Because I do think that's part of the motion, and just in the last --

COURTROOM DEPUTY: It's a Monday, the Monday before Thanksgiving.

THE COURT: Okay. Well, let's do that deadline, November 23rd for the severance motion.

MR. MORROW: It's good.

THE COURT: Like that?

Okay. And then I can set a hearing sometime after that. Obviously I want responses. I know I've got a Sherman case in December, and my daughter is having surgery. So, I've got days that I won't be available; but we can have a hearing sometime then.

MR. BLACK: And that's a priority motion, your

Tonya B. Jackson, RPR-CRR
051984 409.654.2833

Case 1:13-cv-00723-MAC-CLS Document 160-4 Filed 01/25/23 Page 27 of 35 PageID #: 9194

Status Conference

27

Honor, from our perspective I think that we're working on and based on some of the discovery that we've recently received and some other information we've received through our own investigation and that's coming together, but that would be part of our severance motion that we're presenting to the court.

THE COURT: Okay.

MR. BLACK: So, we'll have that timely done.

THE COURT: Okay. Well, considering I'm not inclined to that right now, I'm not saying I won't do it. I'll consider that.

But the other impact is on what we do right now. So, I think Ms. Harper needs to get more people, thinking -- if we don't sever -- I like the two-day approach, the *déjà vu* approach of that, and probably 30 peremptories per side.

Mr. Batte doesn't have to use them all, but that's what I think would be appropriate.

MR. BATTE: That's fine, judge. Did you set a deadline -- did you set a deadline for the motion to sever?

THE COURT: Right. That's November 23rd.

MR. BATTE: Okay. I can have that motion done in seven days or less, if you need it in less.

THE COURT: Well, obviously the sooner the

Case 1:09-cr-00015-MAC-KFG  Document 379  Filed 10/06/10  Page 28 of 35 PageID #: 1195
Status Conference

28

better because I'm not going to schedule a hearing until I have it.

MR. BATTE:  Okay.

THE COURT:  But right now that -- the Sherman trial is scheduled for what date?

COURTROOM DEPUTY:  December 7th.

THE COURT:  December 7th.  And I have to do something -- some judicial conference committee meeting in Tucson the first three days of December.  So, it's like it gets bad.  And then my daughter is having surgery.  But we'll figure out some day.

MR. BATTE:  Okay.

THE COURT:  But it may be really close to Christmas.

MR. BATTE:  For the hearing, you mean?

THE COURT:  Uh-huh, for the hearing.

MR. BATTE:  That's fine.  The other responses I don't think you stated but I presume that since you're moving the other motion deadlines for the defense to December -- from November 7th to December 7th -- our responses were due November 30th.  So, our responses would be due December 30th?  Is that --

THE COURT:  Well, I moved it from November 9th to December 9th.

MR. BATTE:  Right.

THE COURT: Okay. November 30th was -- your response to guilt/innocence motions was November 30th. So, is December 30th --

LAW CLERK: It's a Wednesday.

THE COURT: December 30th?

COURTROOM DEPUTY: Is a Wednesday.

THE COURT: That's fine.

MR. BATTE: Okay.

THE COURT: Okay. Anything else we want to talk about with regard to scheduling?

And I'll do an order that will fix -- will set the severance motion deadline and then -- okay.

Now, when did you say you want to do -- November -- yeah, that's severance motion response -- no, severance motion is going to be filed by November 23rd. So, when is the deadline for -- when do you want to respond to the severance motion?

MR. BATTE: November 30th.

THE COURT: Is that a business day?

COURTROOM DEPUTY: Monday.

THE COURT: Okay. So, we have the severance motion filed November 23rd -- or you can file it sooner -- and then the response would be due November 30th.

And then the other motions December 9th and

Case 1:13-cv-00723-MAC-CLS Document 160-4 Filed 01/25/23 Page 30 of 35 PageID #: 16197

Status Conference

30

the -- then December 30th on the responses to that.

Okay.  Anything else?

MR. MORROW:  Judge, before you break for the morning session, we would ask if you would give us a few minutes *ex parte* this morning.  We think it would make things go easier later on if you would give us a few minutes to meet with you.

THE COURT:  Okay.  Anything else before we --

I think, Ms. Harper, that gives you more idea to like get lots of people.

MS. HARPER:  That's fine.

THE COURT:  Yes.  That'll make your work busier, but -- okay.  I think you can step down.

MS. HARPER:  We're at the very beginning; so, that's fine.

THE COURT:  Okay.  All right.

MR. BARLOW:  May I bring up one issue, your Honor?

THE COURT:  Yes.

MR. BARLOW:  Regarding the peremptory challenges.  I was reading the statute.  I think the statute says the court may allow additional peremptory challenges to multiple defendants, but I don't think it addresses allowing additional peremptory challenges to the government.

Tonya B. Jackson, RPR-CRR
051988409.654.2833

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 31 of 35 PageID #: 1198

Status Conference

31

THE COURT: Well, you can brief that. I think anytime I add peremptories for one side, I add it to the other side as well.

MR. BLACK: I've never had that particular issue come up, your Honor. I've just never seen the prosecution, or the government, allowed additional peremptory challenges. I think the statute or the rule only speaks to the defendant, but I'll see what kind of case law I can come up with that deals with that.

THE COURT: Okay. Well, the government may not want more. I don't know.

MR. BLACK: They may want less. I don't know, but -- but we'll see.

THE COURT: But generally I try to equalize it. Maybe I've been doing that and no one complained but --

MR. BLACK: In a civil case, I think -- I've seen that done in civil cases before but in a criminal case, I think we're dealing with a different rule and a different statute and I think that's why the statute only deals with additional peremptory challenges to the defense and the prosecution is not allowed any.

THE COURT: That may be right.

MR. BARLOW: Your Honor, I believe the logic behind that is the reason the additional peremptory

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 32 of 35 PageID #: 1199
Status Conference

32

challenges, when there are multiple defendants, are allowed is because sometimes we have competing interests and different interests in what type of juror we want to select; but the government has the same type of interest in its jury selection process. So, there's no logic for the government to need additional challenges just because there are multiple defendants.

MR. BATTE: And all that makes sense, judge. What I can tell you is I will research this matter; and if we're not entitled to it, we won't ask for any.

THE COURT: Okay. Just let me know.

All right. Anything further?

MR. BOURQUE: I -- as long as they've brought it up, what I have seen is they're not given the identical number we're given. If you give the defense side 30, that's basically 15 for Mr. Snarr and 15 for Mr. Garcia, if you sort of do the math that way. What I have seen happen, instead of giving the government the same 30 that the defense side has been given, is they're given like 22. They're given maybe a couple more or three more, but they're not given that identical --

THE COURT: I'll research this whole issue. I mean, that makes sense when you have a regular criminal case where the defense has more than the government to start with; and, so, you would not -- if you got extras,

Case 1:09-cr-00015-MAC-KFG Document 379 Filed 10/06/10 Page 33 of 35 PageID #: 1200

Status Conference

33

you wouldn't have the same amount.  So, I don't -- we'll research this and do the right thing.

MR. BOURQUE:  Thank you, judge.

THE COURT:  Okay.  But I encourage you to research it as well.

Okay.  Anything else?

MR. BATTE:  No, your Honor.

MR. MORROW:  No, your Honor, not from us.

THE COURT:  Anyway, I still think it's a good idea for Ms. Harper to get a lot of people out there and we can decide later what we're going to do about it, but having the pool built up enough would be good.

Okay.  If there's nothing further, then I guess you're excused on this part.

And then if you want to meet in chambers -- just the lawyers in chambers?  Is that what you want to do this morning?

MR. MORROW:  Yes, your Honor, please.  With this group of lawyers (indicating), not that group of lawyers.

THE COURT:  Right, I understand.

MR. MORROW:  Okay.

THE COURT:  Okay.  Thank you.

(Recess, 10:49 a.m. to 11:08 a.m.)

(Open court, counsel for defendants and

Case 1:13-cv-00723-MAC-CLS Document 160-4 Filed 01/25/23 Page 34 of 35 PageID #: 15161
Status Conference

34

defendants present, counsel for government not present)

THE COURT: All right. I think counsel wanted to put on the record some comments about this afternoon's proceedings.

MR. BLACK: Yes, your Honor. Patrick Black on behalf of Mr. Snarr. It is our position, your Honor, that the subject matter that we're dealing with this afternoon, specifically the case budget for the two defendants, is not a critical stage of the proceedings and, therefore, the defendants do not have a constitutional right and it is not required for them to be physically present at the court's hearing this afternoon.

In addition to that, my client, Mr. Snarr, is willing to forego any right that he would have, if any, to be here; and he's willing to be transported back to Houston today. So, we would ask that Mr. Snarr be allowed to not be in attendance this afternoon and that he be allowed to return to his place of incarceration in Houston, Texas.

THE COURT: All right. Mr. Snarr, do you have a problem with that?

DEFENDANT SNARR: No.

THE COURT: All right. That's granted.

MR. MORROW: Judge, we would make the same

request for Mr. Garcia on exactly the same basis. We've reviewed the matters that will be going on this afternoon, and we'd ask that he be excused to return to Houston.

THE COURT: All right. Mr. Garcia, is that acceptable to you?

DEFENDANT GARCIA: Yeah, that's okay.

THE COURT: All right. Very well. That will be done.

MR. BLACK: Thank you, your Honor.

THE COURT: So, we'll see you this afternoon.

MR. MORROW: Judge, we hadn't quite completed --

THE COURT: Oh, okay. Well, go ahead and -- we'll see you in chambers in a moment.

MR. MORROW: Yes.

THE COURT: Okay.

(Proceedings adjourned, 11:10 a.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, AUGUST 9, 2010, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

/s/ Tonya Jackson
TONYA JACKSON, RPR-CRR