IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| EDGAR BALTAZAR GARCIA | § | |
| | § | |
| V. | § | Civil No. 1:13-CV-723 |
| | § | Criminal No. 1:09-CR-15(2) |
| UNITED STATES OF AMERICA | § | |

## RESPONSE TO JOINT MOTIONS TO RECUSE

Movants Edgar Baltazar Garcia and Mark Isaac Snarr have each filed a "Joint Motion and Memorandum in Support of Motion for Recusal." The motions relate to a jury-selection issue that was initially raised in movants' Section 2255 motions, both of which were filed in 2015, and further fleshed out in their amended Section 2255 motions filed in November 2021 (Garcia) and January 2022 (Snarr). The government filed amended responses to the Section 2255 motions in February 2022 (Garcia) and April 2022 (Snarr). Garcia replied in June 2022, and Snarr replied in July 2022.

On January 25, 2023, almost eight years after filing their Section 2255 motions and more than six months after their last replies, Snarr and Garcia filed motions urging the Court to recuse itself and reassign the case to another district. In separate motions, they also seek discovery from various individuals, including the Court, the former Clerk, and clerk's office staff. The government opposes recusal for several reasons, including lack of support for allegations against the Court, untimeliness, and the failure to meet the requirements of 28 U.S.C. § 455.

### I. Factual Clarifications

After years of assiduously sealing their pleadings, movants chose not to seal these motions, which level unsupported allegations against the Court. But whatever movants' reasons

for not sealing the motions to recuse, *see United States v. Pollard*, 959 F.2d 1011, 1031 n.13 (D.C. Cir. 1992) (The court—including then-Circuit-Judge Ruth Bader Ginsburg—astutely observed that the motion to recuse "may have been designed primarily to force the judge to recuse himself."), the government agrees with little of what movants present as "fact."  Before turning to the legal issues, two factual points require specific clarification.

**A.      First, the record does not support movants' allegations of ex parte contact.**

Movants claim that a secret, illegal jury wheel was created for their trial and contend that "the first time that the Court or its staff advised that the jury in the present proceeding was not selected from one of the Master Wheels authorized by the Jury Plan but from some other Wheel" was in an email that writ counsel received from jury coordinator Beth Harper dated January 15, 2020.  Garcia Mtn. p. 10; Snarr Mtn. p. 10.  That is not accurate.  On October 30, 2009—months before movants' trial started in April 2010—the Court conducted a status conference that Harper attended to "discuss the progress being made on getting the jury."  SC Tr. 10/30/2009, p. 3.  Harper informed the parties that a "new" jury wheel was being created "for this case":

> THE COURT: All right. Ms. Harper, do you want to come talk about the jury?
>
> MS. HARPER: *We are just now starting the process of building our new jury wheel for this case.*  We will be sending out approximately 1500 to 1700 juror qualification questionnaires.  That is our first step in our procedure, which is outlined by our jury plan.
>
> (Reading) Prospective jurors will be mailed a qualification questionnaire form to complete and return to the court.  After the court determines that they are qualified to serve, the names are entered into a pool and then they will be randomly summoned for the jury selection date.…  The juror names are chosen at random from a master registration list that is maintained by the Secretary of State of all persons registered to vote.
>
> And I do have a copy of the jury plan and the juror questionnaire that we'll be sending out, if each side would like a copy of that.

* * *

2

MS. HARPER: That's all I have at this point.

SC Tr. 10/30/2009, pp. 10-11 (emphasis added).

The Court went on to discuss other jury selection matters—*e.g.*, peremptory challenges, the estimated number of excuses, the number of prospective jurors needed, and the logistics of voir dire with a panel of more than 200 prospective jurors—with counsel and Harper.  SC Tr. 10/30/2009, pp. 11-33.

The record shows nothing else about the jury wheel or how it was populated.  But in their joint motions, movants make the following unsupported allegations about the Court:

> In addition to this status hearing, *the Court engaged in other, off the record, communication with counsel regarding the process and progress of assembling the venire* and *it was apparent that Judge Crone was receiving information from Ms. Harper regarding the jury selection process in the absence of the parties*. Judge Crone clearly worked hard on the jury selection and was *actively engaged in the process both on and off the record, and both in the presence of and in the absence of defense counsel*.

Garcia Mtn. p. 4; Snarr Mtn. p. 4 (emphasis added).

Although movants offer no specific instances of any off-record communications, they return to these unsupported allegations to "show" that the Court is biased:

> [T]he personal bias or personal knowledge of Judge Crone derives from: Judge Crone's role and responsibility as supervisor of the jury selection process; *Judge Crone's off the record and ex parte communications with jury coordinator*, Beth Harper, regarding the process of jury selection in this and other cases involving similar problems with the assembly of the venire; *Judge Crone's off the record communications with trial counsel about the selection of the venire* in this case; Judge Crone's long-time working relationship with relevant court staff; and, Judge Crone's opinion, based on many years of working together, of the credibility of court staff.

Garcia Mtn. p. 17; Snarr Mtn. p. 17 (emphasis added).

These merits of these allegations are addressed below, but they prompt two initial observations: First, although the parties were on notice that a new wheel was being created,

*nothing* in the record points to any communication between the Court and Harper about the crux of movants' argument—*how the jury wheel was populated*.  Movants cast a broad net, insinuating that *any* contact between the Court and Harper about *any* aspect of the jury selection process without counsel would have been inappropriate, referring to such as "off the record and *ex parte*."[1]  Not so.  As movants point out, the Clerk and clerk's office staff are employees of the Court.  Garcia Mtn. p. 11-12; Snarr Mtn. p. 11-12.  And the district's jury plan envisions Court oversight of jury selection through the Clerk: "The clerk of the court shall manage the jury selection process. The clerk shall act under the supervision and control of the judges of this district."  Garcia ECF Doc. 160-2 p. 3.  Thus—even though there is no indication of any contact between the Court and Harper regarding population of the jury wheel—communication between the two about the jury selection process would have been no more remarkable than writ counsel discussing filing their motions in this case with their staff.

Second, there is *nothing* in the record to support movants' claims that the Court had "off the record communications with trial counsel about the selection of the venire."  Again, nothing. Writ counsel were not present during the trial and have carefully shielded the allegations in their Section 2255 motions from their trial teams.  Nor do they provide affidavits from trial counsel regarding alleged *ex parte* communications.  Thus, these allegations cannot even be supported with claims of "information and belief."

**B.      Second, movants' conclusions about how the jury wheel was populated have not been verified by the government.**

In their initial Section 2255 motions, movants contended that there were "multiple

---

[1]  Movants appear to be confused about the meaning of the term "*ex parte*."  "BLACK'S LAW DICTIONARY (4th Ed., 1968) defines *ex parte* as meaning: 'On one side only; by or for one party; done for, in behalf of, or on the application of, one party only.'"  *United States v. Meriwether*, 486 F.2d 498, 506 (5th Cir. 1973).  The Court's communications with its staff are not *ex parte*.

indications" that the jury venire was not drawn randomly, primarily because of the admittedly unusual circumstance of eight married couples—16 people—on the 308-member venire. These were not hidden relationships; the parties commented on the anomaly during jury selection. *E.g.*, Ind. V/D Vol. 10, p. 2298. After obtaining more information from the Court and hiring an expert in political polling and jury procedure, movants now contend that the Court and its staff— including a now-retired Clerk of the Court and Harper—violated the Jury Service and Selection Act (JSSA) and the Eastern District Jury Plan by selecting their jury from an alleged "unauthorized Special Wheel and a non-random method of selection," which movants argue resulted in a jury panel that was not drawn from a fair cross-section of the population. Garcia Mtn. p. 3; Snarr Mtn. p. 3. But the expert's report appears to back into an opinion based on demographics, such as the number of married couples on the panel. *E.g.*, Garcia 2255 ECF Doc. 160-3, pp. 6-7; Snarr 2255 ECF Doc. 149, pp. 6-7 (Attachment 2, sealed). And despite movants' reliance upon the report as "fact," it has not been reviewed independently by experts for the Court or the government.

More important, it may never need to be reviewed. The government's amended responses to movants' Section 2255 motions point out that movants' claims under the JSSA and their fair-cross-section claims are both legally and procedurally barred. Garcia 2255 ECF Doc. 146, pp. 274-87; Snarr 2255 ECF Doc. 134, pp. 29-42. Given the page limitations and the fact that those arguments are sealed, the government respectfully refers the Court to the amended response for those arguments. *Cf.*, *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) ("[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by

reference, and matters of which a court may take judicial notice.'" (internal citations omitted)).

Because movants' Section 2255 claims are procedurally and legally barred, the grounds

advanced in their peripheral motions to recuse are irrelevant.

## II.  Movants' Motions to Recuse are Untimely

As an initial matter, movants' motions to recuse should be denied because they are

untimely.

The Fifth Circuit infers "a timeliness requirement from § 455," but has "declined to adopt

a per se rule on untimeliness."  *United States v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998)

(citing *Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 216 (5th Cir. 1998)).  Nevertheless,

"[t]he general rule on timeliness requires that 'one seeking disqualification must do so *at the

earliest moment after knowledge of the facts demonstrating the basis for such disqualification*.'"

*Id.* (emphasis added) (quoting *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410

(5th Cir. 1994)).  For example, in *Andrade v. Chojnacki*, 338 F.3d 448, 459-60 (5th Cir. 2003),

the Fifth Circuit found a ground for recusal untimely when the appellants (1) knew of the judicial

comments complained of two weeks before the district court's order on a previously-filed motion

to recuse, (2) failed to supplement the motion, and (3) waited until appeal to raise the issue.

Here, movants were aware that a "new" jury wheel was being created for their case

before trial.  SC Tr. 10/30/2009, pp. 10-11.  As for how that wheel was populated, the unusual

circumstance of eight married couples—16 people on the 308-member venire—was obvious

during jury selection.  *E.g.*, Ind. V/D Vol. 10, p. 2298.  But even assuming the most generous

time of knowledge, movants were aware of the "facts" they now allege on November 18, 2021,

the day their expert presented his report.  *See* Garcia 2255 ECF Doc. 160-3, p. 18; Snarr 2255

ECF Doc. 149, p. 18.  Since that date, movants have filed their amended Section 2255 motions—

Garcia in November 2021 and Snarr in January 2022—and replied to the government's amended responses—Garcia in June 2022 and Snarr in July 2022.  Yet movants did not file their motions to recuse until January 25, 2023, more than one year after November 18, 2021, and more than six months after their last replies.  Under these circumstances, no one can seriously argue that movants filed their motions to recuse "at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification" were discovered.  *Sanford*, 157 F.3d at 988.  Their motions to recuse should be denied as untimely.

### III.  Recusal is Not Warranted

Movants argue that recusal is required under the following three provisions of 28 U.S.C. § 455, which addresses disqualification of judges:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

\* \* \*

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

\* \* \*

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(a), (b)(1), (b)(5)(iv); Garcia Mtn. pp. 14-15; Snarr Mtn. pp. 14-15.

The Fifth Circuit applies "several interpretative guidelines" to Section 455 that should assist the Court in evaluating movants' arguments.  *Andrade*, 338 F.3d at 454.  First, the standard is objective and fair-minded: alleged grounds for recusal are viewed with "reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and

suspicious person.'" *Id.* at 455 (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)). Second, the evaluation should "entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents." *Id.* (citing *Sao Paulo State of Federative Rep. of Brazil v. Am. Tobacco Co.*, 535 U.S. 229, 232-33 (2002); *United States v. Avilez-Reyes*, 160 F.3d 258, 259 (5th Cir. 1998)). Finally, "the origin of a judge's alleged bias is of critical importance." *Id.* "[T]his rule more or less divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal." *Id.* (footnote omitted) (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Simply put, "intra-judicial" events require "a more deferential review" than those of "extra-judicial" origin. *Id.* at 456.

"[E]ach recusal case 'is extremely fact intensive and fact bound, and must be judged on its unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.'" *United States v. Brocato*, 4 F.4th 296, 302-03 (5th Cir. 2021) (quoting *Jordan*, 49 F.3d at 157). Here, movants fail to make a case for recusal under Section 455(a), Section 455(b)(1), or Section 455(b)(5)(iv).

**A.    Movants fail show that a reasonable observer—or, indeed, any observer—would harbor doubts concerning the Court's impartiality, so recusal is not warranted under Section 455(a).**

Movants conflate their arguments for Section 455(a) and Section 455(b)(1), but the "provisions afford separate, though overlapping, grounds for recusal. Subsection (b)(1) pertains to specific instances of conflicts of interest, while subsection (a) deals with the appearance of partiality generally." *Andrade*, 338 F.3d at 454. The sections are better considered separately.

The Fifth Circuit has quoted Justice Kennedy's concurrence in *Liteky* when addressing Section 455(a):

8

> § 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings," such that recusal was required "if it appears that [the judge] harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

*United States v. Brocato*, 4 F.4th 296, 302 (5th Cir. 2021).

Movants' arguments for recusal under Section 455(a) are not models of clarity or specificity, and those failures are fatal to their cause. First, they argue that

> [T]he personal bias or personal knowledge of Judge Crone derives from: Judge Crone's role and responsibility as supervisor of the jury selection process; Judge Crone's off the record and *ex parte* communications with jury coordinator, Beth Harper, regarding the process of jury selection in this and other cases involving similar problems with the assembly of the venire; Judge Crone's off the record communications with trial counsel about the selection of the venire in this case; Judge Crone's long-time working relationship with relevant court staff; and, Judge Crone's opinion, based on many years of working together, of the credibility of court staff.

Garcia Mtn. p. 17; Snarr Mtn. p. 17. Movants essentially reiterate these claims, in expanded form, later in the motion, adding the allegation that the Court cannot impartially consider "whether the Court and its staff violated the Constitution, the Jury Plan, and the Jury Selection and Service Act by selecting a non-random, unrepresentative jury venire." Garcia Mtn. pp. 24-26; Snarr Mtn. pp. 24-26.

Fairly viewed, nothing about these non-specific slurs would cause a well-informed, thoughtful, and objective observer to question the Court's impartiality. As noted above, the record offers no support for any off-record communications between the Court and *anyone* regarding movants' actual complaint—how the jury wheel was populated—and movants point to *no* specific instances of *ex parte* communications. Fair-minded observers would not credit such sketchy, unsupported allegations. *Cf.*, *Andrade*, 338 F.3d at 456-57 (even specific *in camera* statements by judge not sufficient to create appearance of impartiality).

9

As for the Court's relationship with the former Clerk and his staff, the record merely demonstrates that the Court has a professional relationship with Harper. *See* SC Tr. 10/30/2009, pp. 10-33. And the record shows nothing about the Court's relationship with the two other specifically-identified individuals, Clerk David Maland and Operations Manager Terri Splawn, *see* Garcia Mtn. p. 17 n.25; Snarr Mtn. p. 17 n.25, both of whom are no longer in federal service. Given the dearth of facts regarding any kind of personal relationship between the Court and these individuals, no well-informed, thoughtful, and objective observer would question the Court's impartiality based solely on professional relationships. *Cf.*, *Andrade*, 338 F.3d at 456-57 (judge did not err in denying motion to recuse based on his relationships with prosecutor and former colleague on the bench because "no facts [we]re proven to suggest that either prior relationship evinces characteristics that would even suggest, much less mandate recusal") (citing *Parrish v. Bd. of Comm'rs.*, 524 F.2d 98, 104 (5th Cir. 1975)).

Likewise, nothing about the Court's "role and responsibility as supervisor of the jury selection process" gives rise to the appearance of impartiality. While the district's jury plan envisions Court oversight of the process, the *clerk* is the one tasked with managing the process for populating the jury wheel. Garcia I Doc. 160-2 p. 3. The plan describes the procedure to be used:

> *The clerk of the court shall manage the jury selection process.* The clerk shall act under the supervision and control of the judges of this district.
>
> This district, by adoption of this plan, has elected to operate the jury selection process under a *fully automated, electronic data processing system*.
>
> Texas law provides for a statutory registration of voters of the age of 18 years and upwards, which is uniform in all of the counties. Voter registration lists represent a fair cross section of the community in the Eastern District of Texas. Accordingly, the names of all grand and petit jurors serving on or after the time provided in this plan shall be selected at random from the Master Registration Lists maintained by the Secretary of the State of Texas of all persons registered to

10

vote in the most recent federal general election held every two years.

\* \* \*

For each jury division, names of prospective jurors shall be determined by the following procedure.  The voter registration lists shall be arranged numerically by voter certificate number within the county and the counties shall be arranged alphabetically to form one continuous list of names for each division.  Each name shall then be numbered consecutively to form a Master Source List.

*Random selections from the Master Source Lists may be made using a computer-generated random selection process to select the required number of names from the Master Source List* in order to insure that (a), any group of names chosen will represent, in substantially correct proportions, the names on all voter registration lists of all counties comprising the master jury wheel; (b), that the mathematical odds of any single name being picked are substantially equal, and (c), that the possibility of human discretion or choice affecting the selection of any individual's name is eliminated.

\* \* \*

Upon completion of the random selection of names for the divisions' master jury wheels, *the individual(s) who performed the task of randomly selecting the names pursuant to this Plan shall prepare and execute a certificate detailing their procedures and reporting on the performance and completion of the assignment* and transmit the same promptly to the *chief judge* of the district.

Garcia I Doc. 160-2 pp. 3-4 (section headings omitted and emphasis added).

Here, even if movants' allegations about how the jury wheel was populated or the method of selection ultimately turn out to be correct, only the most hypersensitive, cynical, and suspicious person would believe that the Court—a busy federal district judge—somehow participated in the "fully-automated" process or, in fact, had any knowledge of it.  The Court was not the chief judge of the district, *see* http://www.txed.uscourts.gov/?q=history-judges-succession, so the Court would not even have been copied with the certificates prepared by Sutera Data Systems, the contractor actually responsible for selecting names for the jury wheels at the time.  Given the structure of the district's jury plan, the Court's role in jury selection does not raise an appearance of impartiality.

In short, the record shows that the Court's goal was to conduct a fair and efficient jury

11

selection from a dauntingly-large panel of prospective jurors, *e.g.*, SC Tr. 10/30/2009, pp. 10-3; SC Tr. 02/01/2010, pp. 3-4; Final PTC 03/29/2010, pp. 3-10, but it does not show that the Court had anything to do with the issues at the heart of movants' complaints: how the jury wheel used for their trial was populated and whether the selection was random.  And movants' arguments that an appearance of impartiality flows from the Court's consideration of whether the jury selection in this case "violated the Constitution, the Jury Plan, and the Jury Selection and Service Act by selecting a non-random, unrepresentative jury venire," Garcia Mtn. pp. 24-26; Snarr Mtn. p. 24, is meritless.  Like many employers, the federal court system provides for court oversight of district employees, so the Court's examination of the actions of employees is to be expected. *See*, *e.g.*, https://www.uscourts.gov/about-federal-courts/judicial-administration/administrative-oversight-and-accountability.  And one of the reasons 28 U.S.C. § 2255 was enacted in 1948 was to direct constitutional claims such as those raised by movants to the district judge who tried the case. *United States v. Hayman*, 342 U.S. 205, 210-18 (1952) (discussing history of and reasons for Section 2255); 28 U.S.C. § 2255(a) (providing that a prisoner may file a motion on the "ground that the sentence was imposed in violation of the Constitution or laws of the United States").  A fair-minded observer would find no appearance of impartiality in the Court considering claims that Congress intentionally directed to her.[2]

---

[2]  Movants' claim that "it is only relatively recently that this Court has ended a practice of having a different judge hear § 2255 proceedings than the judge who presided at trial," Garcia Mtn. p. 21; Snarr Mtn. p. 21, is not entirely accurate.  While two capital cases have been transferred, there is no evidence that it was a district "practice."  Indeed, *Agofsky v. United States*, No. 1:07-CV-511 (E.D. TX Feb. 25, 2008), was transferred by then-Chief-Judge Heartfield less than two years before he took senior status, *see* https://en.wikipedia.org/wiki/Thad_Heartfield, a consideration that could have factored into the decision.  And the order from this Court transferring the Section 2255 proceeding in *Jackson v. United States*, No. 1:09-CV-1039 (E.D. TX July 23, 2010), does not indicate the reason for the transfer.  Nevertheless, the government did not endorse either transfer, and transfer of Section 2255 motions undermines the practical reasons that Congress assigned the proceedings to the sentencing court when it enacted Section

12

**B.**     **Movants fail show that the Court has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts that warrant recusal under Section 455(b)(1).**

In 2020, the Fifth Circuit addressed the standards for recusal under Section 455(b)(1) in

*United States v. Lechuga*:

> Section 455(b)(1) requires a judge to recuse himself where he "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."  § 455(b)(1).  Generally, to warrant recusal under § 455(b)(1), the judge's "bias or prejudice" or "personal knowledge of disputed evidentiary facts" must stem from an extrajudicial source.  *See Andrade*, 338 F.3d at 455; *Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998).…
>
> While the presence or absence of an extrajudicial source is a significant factor, an extrajudicial source alone is neither a necessary nor sufficient condition for recusal.  *Liteky*, 510 U.S. at 554-55….  The rule concerning extrajudicial sources "more or less divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal."  *Andrade*, 338 F.3d at 455 (footnote omitted) (citing  *Liteky*, 510 U.S. at 555…).  "Non-extrajudicial facts 'do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Tejero v. Portfolio Recovery Assocs.*, 955 F.3d 453, 463 (5th Cir. 2020) (quoting *Liteky*, 510 U.S. at 555…).

*United States v. Lechuga*, 820 F. App'x 261, 263 (5th Cir. 2020) (unpublished).

Movants claim that the Court "holds a personal bias or has obtained personal knowledge through her supervision of, *ex parte* communications with, and long-term working relationship with the jury coordinator and other court staff implicated in the [allegedly] unlawful jury selection process in this case."  Garcia Mtn. p. 16; Snarr Mtn. p. 17.  As support, movants rely on the same non-specific allegations set out above:

> the personal bias or personal knowledge of Judge Crone derives from: Judge Crone's role and responsibility as supervisor of the jury selection process; Judge

---

2255.  *Hayman*, 342 U.S. at 210-18; *see also Pollard*, 959 F.2d at 1031 ("'[T]he judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion'; indeed, his ability to do so is one of the advantages of § 2255 relative to habeas corpus for state prisoners.") (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977)).

> Crone's off the record and *ex parte* communications with jury coordinator, Beth Harper, regarding the process of jury selection in this and other cases involving similar problems with the assembly of the venire; Judge Crone's off the record communications with trial counsel about the selection of the venire in this case; Judge Crone's long-time working relationship with relevant court staff; and, Judge Crone's opinion, based on many years of working together, of the credibility of court staff.

Garcia Mtn. p. 17; Snarr Mtn. p. 17 (footnote omitted).

These allegations offer even less support for recusal under Section 455(b)(1) than they did for Section 455(a) because movants utterly fail to show that the Court harbors *any* personal bias or prejudice against them or for the government or that it has *any* personal knowledge of disputed evidentiary facts.  Movants have simply built the proverbial house of cards, stating their suppositions regarding jury selection as fact and speculating on the Court's knowledge based on those "facts."  No fair-minded observer would buy it.

The Court is the only one who knows where its personal knowledge lies, but as set out above, the record offers no support for any off-record communications between the Court and *anyone* regarding movants' actual complaint—how the jury wheel used in this case was populated.  Likewise, the record shows that the Court has a professional relationship with Harper, *see* SC Tr. 10/30/2009, pp. 10-33, and it shows nothing about the Court's relationship with former Clerk David Maland and former Operations Manager Terri Splawn.  Given the dearth of actual instances of *ex parte* communications or facts showing personal relationships between the Court and the identified individuals, no well-informed, thoughtful, and objective observer would believe that the Court has a personal bias or prejudice concerning a party or has personal knowledge of disputed evidentiary facts.

Likewise, nothing about the Court's "role and responsibility as supervisor of the jury selection process" under the district's jury plan shows that the Court has personal knowledge

14

about how the jury wheel used in this case was populated. As pointed out above, even if movants' allegations about how the jury wheel was populated and the method of selection ultimately turn out to be correct, only the most hypersensitive, cynical, and suspicious person would believe that a busy federal district judge participated in the "fully-automated" process managed by the clerk's office or even had any knowledge of it. And because the Court was not the chief judge of the district, the Court would not have been copied with the certificates prepared by Sutera Data Systems, the contractor actually responsible for selecting names for the jury wheels at the time. There is simply no basis for assuming that the Court had knowledge of movants' key issue.

Movants contend that Section 455(b)(1) requires recusal "where the presiding judge has the relevant knowledge even if a reasonable observer would not doubt the judge's ability to be impartial," Garcia Mtn. p. 17; Snarr Mtn. p. 17, but in their argument for Section 455(a), they appear to acknowledge a lack of proof regarding the Court's knowledge, contending that, "if' the Court did not know the "facts" they now claim to show, it "certainly should have known" them, Garcia Mtn. p. 25; Snarr Mtn. p. 26. "Should have known" does not suffice for personal knowledge under Section 455(b)(1), and movants offer no proof that the Court has knowledge of relevant facts warranting recusal.[3]

Finally, despite their failure to show that the Court had any knowledge of the "facts" forming the basis for the motion to recuse, movants devote much of their Section 455(b)(1) argument to the issue of whether the Court's alleged knowledge was "intra-judicial" or "extra-

---

[3] Movants admit as much in their motions for discovery related to recusal, asking the Court to make "voluntary disclosure" of specific instances that might supply some support—indeed, any support—for their conclusory allegations. Garcia 2255 ECF Doc. 162, pp. 8-10; Snarr 2255 ECF Doc. 150, pp. 8-10.

judicial" in origin.  Garcia Mtn. pp. 17-19; Snarr Mtn. pp. 17-20.  Movants claim that "Judge Crone's activities in administering and supervising the Jury Plan count as extra-judicial," Garcia Mtn. p. 17; Snarr Mtn. p. 17, but their argument is long on inapposite case law and short on application to the facts.

The Supreme Court makes short work of movants' argument that the Court's knowledge about how the jury wheel was populated—if, indeed, the Court has knowledge about the issue—is extra-judicial.  In *Liteky*, the Court made clear that "routine trial administration efforts" are not extra-judicial because they "occurred in the course of judicial proceedings, and neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible."  510 U.S. at 556.  It is difficult to conceive of jury selection as anything other than "routine trial administration."  Movants further "commend" out-of-circuit authority on whether *in camera* briefings are extra-judicial, Garcia Mtn. pp. 18-19; Snarr Mtn. pp. 19-20, while ignoring *United States v. Lechuga*, in which a panel of the Fifth Circuit found that *in camera* briefings to a judge regarding a defendant's false claim that the judge had been threatened—a claim that was part of a hoax to curry favor at sentencing—were not extra-judicial and did not support recusal.  820 F. App'x at 263-64.

C.      **Movants fail show that the Court is likely to be a material witness in their Section 2255 proceeding, so recusal is not warranted under Section 455(b)(5)(iv).**

In their third arguments under Section 455, movants contend that the Court "was a witness on the record and off to the process that produced the tainted Special Wheel and the trial venire and was a witness to communications between herself and court staff responsible for the jury selection" and thus should recuse itself under Section 455(b)(5)(iv).  Garcia Mtn. p. 20; Snarr Mtn. p. 20.  As noted above, however, movants have not proved that the jury wheel used in

their case was "tainted," nor have they shown that the Court had any communications regarding how the wheel was populated.

Relevant to this case, Section 455(b)(5)(iv) mandates recusal when a judge is "likely to be a material witness in the proceeding." Movants cite no cases in support of this ground and for factual support merely refer to the "same list of entanglements as described above," presumably the Court's working relationship with its staff. Garcia Mtn. p. 20; Snarr Mtn. p. 20. While there is not a plethora of case law on Section 455(b)(5)(iv), *United States v. Pollard*, a Section 2255 appeal to the District of Columbia Circuit, stands out, not only because it involves well-known jurists and lawyers, but because it presents failures in proof similar to those in this case:

> In a quite unusual case, surely the most extraordinary claim raised by the appellant is his contention that the district judge improperly considered information conveyed to him *ex parte* by the government. This rather shocking charge is based on an alleged conversation between Chief Judge [Aubrey E.] Robinson [of the D.C. district court] and former Supreme Court Justice [Arthur] Goldberg, who, after having been contacted by Professor [Alan] Dershowitz, set out to determine the reasons for Pollard's life sentence. The *ex parte* information is said to indicate that Pollard passed information to the Israelis demonstrating United States' knowledge of secret cooperation between Israeli and South African defense agencies. The Chief Judge supposedly told Mr. Goldberg that this information "weighed heavily" in his sentencing determination. As noted earlier, Arthur Goldberg died shortly thereafter and so was not available to be questioned. *But Dershowitz, we are told, has determined that Pollard did not in fact pass such information to the Israelis and that it was not included within the classified summary presented to the district judge and to Pollard's counsel at sentencing; Dershowitz then deduces that the government must therefore have conveyed this information to Chief Judge Robinson ex parte.*
>
> Pollard sought a hearing based on the Dershowitz affidavit and, perhaps more important, asked Chief Judge Robinson to recuse himself. The Chief Judge refused to recuse and denied the hearing. Pollard claims the district court abused its discretion. We think very little of this claim.
>
> A district judge must grant a prompt hearing under § 2255 unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. The decision whether to do so is committed to the district court's discretion. *See* [*Machibroda v. United States*, 368 U.S. 487, 495 (1962)]. *In making this decision, "the judge's recollection of the events at issue*

17

*may enable him summarily to dismiss a § 2255 motion"; indeed, his ability to do so is one of the advantages of § 2255 relative to habeas corpus for state prisoners.* [*Blackledge v. Allison*, 431 U.S. 63, 74 n. 4 (1977)]. Only where the § 2255 motion raises "detailed and specific" factual allegations whose resolution requires information outside of the record or the judge's "personal knowledge or recollection" must a hearing be held. *Machibroda*, 368 U.S. at 495.… *Even if the files and records of the case do not clearly rebut the allegations of the prisoner, no hearing is required where his claims are "vague, conclusory, or palpably incredible." Id.*

*The district judge in this case was, of course, intimately familiar with the record and knew as a matter of fact whether or not the government had submitted ex parte material to him. The Chief Judge attested that it had not.* He accordingly denied the motion for a hearing. *We believe the Chief Judge was well within his discretion to do so. The Dershowitz affidavit was a very weak submission.* It did not suffice to require a hearing into the question it raised, even if the district judge had not been personally aware that Professor Dershowitz's "deductions" were fallacious. *The affidavit included no direct or even hearsay evidence that an ex parte submission had been received.*

959 F.2d at 1030-31 (emphasis added). In a footnote to this passage, the court noted that the motion to recuse "may have been *designed* primarily to force the judge to recuse himself." *Id.* at 1031 n.13 (emphasis added).

Here, as in *Pollard*, movants have alleged that *ex parte* communications took place with no direct or even hearsay evidence that they did. Indeed, movants' allegations lack even the specificity of the "weak submission" presented in *Pollard*. And *Pollard* completely refutes movants claim—made without supporting legal authority—that, if the Court "is to rely upon her own observations and communications[,] then that knowledge must more properly be received as evidence from the witness stand," Garcia Mtn. p. 20; Snarr Mtn. p. 20. *Id.* at 1031. As a panel of the Eleventh Circuit more-recently made clear, recusal under Section 455(b)(5)(iv) is not required based on mere "speculation that the district court judge might be called as a witness." *Daker v. Warren*, 779 F. App'x 654, 658 (11th Cir. 2019) (unpublished). The Court has the discretion to set movants straight on the facts in an order denying their motion to recuse.

18

Additionally, materiality and harm are factors to be considered under Section 455(b)(5)(iv).  *See De Angelis v. City of El Paso*, 265 F. App'x 390, 397-98 (5th Cir. 2008) (unpublished) (no harm where judge's nephew, who was employed by one of the parties, did not appear to be a material witness); *United States v. Robinson*, 439 F.3d 777, 779 (8th Cir. 2006) (no harm from judge's failure to recuse himself when his nephew was a witness in a case before the judge because the "evidence would have been admitted by any judge, and could have been proven, if necessary, through other means").  Here, movants fail to show that the Court has any knowledge of how the jury wheel was populated that would require it to be a witness in this proceeding.  And, as noted above, the Section 2255 claims to which the alleged knowledge relates are both procedurally and legally barred.  *See* Garcia 2255 ECF Doc. 146, pp. 274-87; Snarr 2255 ECF Doc. 134, pp. 29-42.  Thus, even if the Court had some knowledge of how the jury wheel in this case was populated, it would never be material.

**D.   Movants fail to show that "Due Process" mandates recusal.**

In their final allegation, movants argue that "[r]ecusal is required under the Due Process standard given the unacceptable risk of bias and the intractable appearance of bias in Judge Crone presiding over the present cause."  Garcia Mtn. p. 20; Snarr Mtn. pp. 22.  This argument need not detain the Court long.  As an initial matter, movants' vague and conclusory claims regarding the Court no more support a due process claim than their statutory claims.  Moreover, as movants acknowledge, "the 'Due Process Clause demarks only the outer boundaries of judicial disqualifications,' and statutes may impose 'more rigorous standards.'"  Garcia Mtn. p. 23; Snarr Mtn. p. 23 (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986)).  That is what the federal statutes regarding judicial disqualification do.  In a case of national importance, the D.C. Circuit pointed out that "anything impinging" on "the fair-trial right, secured in federal

19

prosecutions by U.S.Const. amend. V … would have more readily violated [28 U.S.C. §]144 or §455." *United States v. Haldeman*, 559 F.2d 31, 130 n.276 (D.C. Cir. 1976). Thus, the reasons set out above showing the deficiencies in movants' grounds for recusal under Section 455 show that there was no due process violation.

## IV. Conclusion

These motions have no merit. They are untimely, and the grounds they identify for recusal are vague, conclusory, and not supported by the record. Thus the United States respectfully urges the Court to deny the motions.

Respectfully submitted,

Brit Featherston
United States Attorney
Eastern District of Texas

/s/ Joseph R. Batte
Joseph R. Batte
Assistant United States Attorney
350 Magnolia, Suite 150
Beaumont, Texas 77701
(409) 839-2538
(409) 839-2550 (fax)
Joe.Batte@usdoj.gov
Texas Bar No. 01918070

/s/ Traci L. Kenner
Traci L. Kenner
Assistant United States Attorney
110 N. College, Suite 700
Tyler, Texas 75702
(903) 590-1400
(903) 590-1439 (fax)
Traci.Kenner@usdoj.gov
Texas Bar No. 11307070

20

**Certificate of Service**

I certify that on March 8, 2023, this document was served by the Court's ECF system on

Christine M. Lehmann and Jason D. Hawkins, counsel for Garcia.

/s/ Traci L. Kenner
Traci L. Kenner
Assistant United States Attorney
